### In re Robert Andrew WARING and Maureen Bryan Waring, Debtors.

#### No. 08–15383.

United States Bankruptcy Court, N.D. Ohio, Eastern Division.

June 3, 2009.

---

Lee Kravitz, Cleveland, OH, for Debtors.

Christian Niklas, Cleveland, OH, for U.S. Bank National Association, as Trustee.

## MEMORANDUM OF OPINION AND ORDER

PAT E. MORGENSTERN–CLARREN, Bankruptcy Judge.

The debtors Robert and Maureen Waring entered into a reaffirmation agreement with "Creditor Saxon Mortgage." On review, the court issued an order identifying deficiencies in the agreement and setting a hearing.[1] When Saxon Mortgage did not respond, the court issued a show cause order. The events that followed are set out in this court's order of February 13, 2009, as well as in *In re Waring*, 401 B.R. 906 (Bankr.N.D.Ohio 2009). The most recent hearing on this issue took place on June 1, 2009. At that time, the court heard oral argument concerning Saxon Mortgage Services, Inc.'s motion for a protective order with respect to an agreement it entered into with Fidelity National

Foreclosure Solutions, Inc. n/k/a LPS Default Solutions, Inc. The United States trustee opposes the motion. For the reasons stated below, Saxon did not meet its burden of proof and the motion is denied.[2]

### JURISDICTION

Jurisdiction exists under 28 U.S.C. § 1334 and General Order No. 84 entered on July 16, 1984 by the United States District Court for the Northern District of Ohio. This is a core proceeding under 28 U.S.C. § 157(b)(2)(O).

### PROCEDURAL BACKGROUND

Among other issues, the show cause hearings have considered the questions of who actually drafted the faulty reaffirmation agreement, how the drafter came to have that responsibility, and who is the holder of the claim entitled to enter into the reaffirmation agreement. *See* 11 U.S.C. § 524(c); FED. R. BANKR.P. 3001. Additionally, the debtors voiced a concern that Saxon Mortgage Services, Inc. (Saxon) charged them a $150.00 fee for entering into the reaffirmation agreement, without court approval.

In the initial hearings, Saxon stated that The Bank of New York Mellon as trustee for an unidentified trust engaged Saxon to service this note and mortgage, together with other similar instruments. Saxon in turn referred the matter to the law firm of Moss Codilis, LLP. At a hearing held on April 9, 2009, counsel for Saxon stated that Fidelity National Foreclosure Solutions, Inc. (Fidelity) played a previously-undisclosed role in the servicing of the Waring note under an agreement between Saxon and Fidelity.[3] An order entered on April

---

1. *See* docket 21 and related orders at docket 23, 25, 32, 35, 39.

2. Docket 49, 55.

3. Saxon's filing states that Fidelity National Foreclosure Solutions, Inc. is now known as LPS Default Solutions, Inc. For ease of read-

10, 2009 instructed Saxon to file the agreement.[4]

Saxon moved for a protective order under 11 U.S.C. § 107(b) asking, in lieu of a public filing, that it be permitted to provide the agreement to the court for *in camera* review, as well as to counsel for the debtors and the United States trustee for the sole purpose of proceeding in this matter.[5] The UST filed a brief in opposition.[6] The court ordered Saxon to provide the agreement as proposed and to be prepared at the June 1, 2009 hearing to identify specific sections of the agreement that it believed were entitled to protection.[7]

The agreement, titled "Default Servicing Agreement between Saxon Mortgage Services, Inc. and Fidelity National Foreclosure Solutions, Inc. dated as of August 25, 2006" and a "First Amendment to Default Services Agreement dated November 12, 2008" (collectively, the agreement) shows, in general, that Fidelity agreed to provide administrative loan default services to Saxon, including working with local attorneys where needed and giving both Saxon and the attorneys access to Fidelity's centralized computer system. What appears to have happened under this agreement is that Saxon (a) hired Fidelity to provide services with respect to the Warings' note; and (b) also referred the matter to Moss Codilis to prepare the reaffirmation agreement with the Warings. According to a Moss Codilis recent filing, Moss Codilis charged Saxon $150.00 to prepare the reaffirmation agreement and Saxon charged

this fee back to the Warings, unbeknownst to Moss Codilis.[8]

## THE POSITIONS OF THE PARTIES

The agreement between Saxon and Fidelity requires Saxon to make efforts to protect the confidentiality of the agreement.[9] To that end, Saxon argued in its motion that the agreement "includes proprietary information regarding practices and procedures implemented by [Fidelity] in its day-to-day business, including the method of communication and method of tracking such communication via propriety [sic] technology developed by [Fidelity] at great cost. Such information is a trade secret." Alternatively, Saxon argued that the agreement should be protected as Fidelity's commercial information because it contains "detailed information regarding the [Fidelity] system [that] will provide competitors of [Fidelity] an unfair look into the business operations and systems of [Fidelity]."

The United States trustee responded in its brief that any protective order should be limited to redacting specific paragraphs containing proprietary information.

At the hearing, Saxon's counsel stated that LPS Default Services Solutions, Inc., through Sheryl Newman, Senior Vice-President and Chief Litigation Counsel, identified these specific provisions as supporting Saxon's argument:[10]

(1) ¶ 2.13 Insurance. This section states the kinds of insurance that Fidelity is required to maintain and

---

ing, the court will refer to Fidelity as the party to the agreement rather than LPS.

4. Docket 39.

5. Docket 49.

6. Docket 55.

7. Docket 77.

8. Docket 47 at 10. The court is stating Moss Codilis's position here without making a finding that it is factually correct.

9. Agreement ¶ 5.1.

10. LPS had notice of the hearing through Saxon, but did not file a notice of appearance of counsel, or otherwise appear.

a minimum coverage limit for each category of insurance.

(2) ¶ 12.10 Notices. This section identifies the corporate officer at Fidelity who is authorized to receive notices under the agreement.

(3) The signature block on page 31. This block states the name and position of the person who signed the agreement on behalf of Fidelity.

(4) Schedules A, B, and C. These schedules identify the services to be performed by each party to the agreement and the "pricing" for those services.

The UST argued that the names and positions of corporate officers are not trade secrets or confidential business information, given that Fidelity was a publicly traded company whose officers and directors are listed in the Form 10–K filed with the Securities and Exchange Commission. Additionally, the UST stated that the agreement at issue was filed in the public record in *Harris v. Fidelitity National Information Services Inc. D/B/A Fidelity National Foreclosure and Bankruptcy Solutions (In re Harris)*, Adv. No. 08–03014 (Bankr.S.D.Tex.), thus showing that Fidelity did not treat the agreement as a trade secret or as confidential. The UST also stated that the plaintiffs' allegations in the *Harris* case were widely reported in the press, including *The Wall Street Journal* and the *New York Times*.[11]

With respect to the latter argument, Saxon responded that the agreement was subject to a confidentiality order in the *Harris* case.

## ADDITIONAL FACTS

The public docket for *In re Harris* shows that on January 16, 2008, debtors Ernest and Mattie Harris filed a complaint against Fidelity National Information Services Inc. dba Fidelity National Foreclosure & Bankruptcy Solutions.[12] Attached to the complaint as exhibit A is a "Network Agreement" between Fidelity National Foreclosure & Bankruptcy Solutions, a division of Fidelity National Title Company, and the law firm of Mann & Stevens, P.C., under which Fidelity and Mann & Stevens agreed to provide services to each other related to foreclosures and bankruptcies. Exhibits A, B, and C to that agreement describe the services Mann & Stevens will provide to Fidelity, the services that Fidelity will provide to Mann & Stevens, and the pricing for those services, all as updated by a modified fee schedule dated October 2, 2007. There is nothing on the docket to show that this document was the subject of a confidentiality order.

The case eventually went forward before the district court, which entered what seems to be a generic order titled "Order Protecting Confidentiality."[13] The order sets out procedures by which either party might designate information produced in discovery as confidential. There is no specific reference in that order to the agree-

---

**11.** *See, for example,* Gretchen Morgenson & Jonathan D. Glater, *The Foreclosure Machine,* N.Y. Times, Mar. 30, 2008, at Sec. BU; Peg Brickley, *Fidelity National is Sued Over Fees,* Wall St. J., Jan. 24, 2008, at D2.

**12.** *Harris v. Fidelity National Financial Information Sevices D/B/A National Foreclosure & Bankruptcy Solutions (In re Harris),* Adv. No. 08–03014 (Bankr.S.D.Tex.). Documents filed with federal courts are available both at the court house where the case was filed and through Public Access to Court Electronic Records (PACER), which provides electronic public access to all case filings.

**13.** *Harris v. Fidelity National Financial Information Sevices D/B/A National Foreclosure & Bankruptcy Solutions (In re Harris),* No. 4:08–cv–01243 (S.D.Tex.), docket 29.

ment that is attached to the adversary proceeding complaint.

### DISCUSSION

■ In general, papers filed in a bankruptcy case are part of the public record and are open to examination by the public. 11 U.S.C. § 107(a). This serves the public interest by facilitating the public's "right to know about the administration of justice" and safeguarding "the integrity, quality, and respect in our judicial system." *Video Software Dealers Assoc. v. Orion Pictures Corp. (In re Orion Pictures Corp.)*, 21 F.3d 24, 26 (2d Cir.1994) (internal quotation marks omitted). There are situations, however, in which the public interest in transparency is outweighed by legitimate commercial concerns. The bankruptcy code balances these interests by providing that public access to filings may be restricted "to protect an entity with respect to a trade secret or confidential research, development, or commercial information[.]" 11 U.S.C. § 107(b)(1). *See also* FED. R. BANKR.P. 9018. The moving party, in this case Saxon, has the burden of proving that the information should be protected. *In re FiberMark, Inc.*, 330 B.R. 480, 496–97 (Bankr.D.Vt.2005).

■ If the information in a filing is either a trade secret or confidential commercial information, the court "is *required* to protect a requesting interested party and has no discretion to deny the application." *In re Orion Pictures Corp.*, 21 F.3d at 27 (emphasis in original). The court does, however, exercise its discretion in determining what type of protection is required. *Phar–Mor, Inc. v. Defendants Named Under Seal (In re Phar–Mor, Inc.)*, 191 B.R. 675, 678 (Bankr.N.D.Ohio 1995).

The terms "trade secret" and "commercial information" are not defined in the bankruptcy code. Courts commonly look to the Restatement of Torts and the Uniform Trade Secrets Act to determine whether information is a trade secret. *See In re El Toro Exterminator of Fla., Inc.*, No. 05–60015, 2006 WL 2882519, at *2 (Bankr.S.D.Fla. Oct. 6, 2006). The Restatement defines a trade secret as "a process or device for continuous use in the operation of the business," and "may ... relate to the sale of goods or to other operations in the business, such as a code for determining discounts, rebates or other concessions in a price list or catalogue, or a list of specialized customers, or a method of bookkeeping or other office management." RESTATEMENT (FIRST) OF TORTS § 757 cmt. b (1939). Factors to be considered under the Restatement include: (1) the extent to which the information is known outside of the business; (2) the extent to which the information is known by employees and others involved in the business; (3) the measures taken to guard the secrecy of the information; (4) the value of the information to the business and to its competitors; (5) the amount of money or effort which was expended to develop the information; and (6) the ease or difficulty by which the information could be acquired or duplicated by others. *Id.*

As noted, another useful definition of trade secret is provided by the Uniform Trade Secrets Act:

"Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and

(ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

UNIF. TRADE SECRETS ACT § 1(4)(1985).

■ Commercial information, on the other hand, is information that is so critical

to an entity's operations that disclosing the information will unfairly benefit that entity's competitors. *In re Orion Pictures Corp.*, 21 F.3d at 27. The disclosure of such information must reasonably be expected to cause commercial injury. *In re Alterra Healthcare Corp.*, 353 B.R. 66, 75 (Bankr.D.Del.2006).

■ Saxon did not meet its burden of proving that the agreement or any part of it is either a trade secret or confidential information.[14] The agreement does call for Saxon to defend the confidentiality of the agreement; that provision gives Saxon standing to raise this issue, but it does not end the inquiry. Saxon did not cite any law or make any factual argument to support the proposition that the identity of Fidelity's corporate officers who are designated to receive notices or authorized to sign agreements is either a trade secret or confidential information. Neither did Saxon prove that disclosing the kinds of insurance Fidelity carries is either a trade secret or confidential information. Virtually every responsible entity doing business carries the kinds of insurance listed in the agreement, and there was no evidence that this information is guarded by Fidelity or that it would benefit a competitor in any appreciable fashion.

■ The request to protect schedules A, B, and C requires more analysis, because these schedules include information such as pricing which may be viewed as confidential commercial information under appropriate facts. As noted, however, the UST points to a public filing in *In re Harris*. An uncontested public filing of information is relevant to show that Fidelity did not view the information as either a trade secret or confidential; otherwise, presumably, Fidelity would have moved to strike the agreement from the record or restrict access to it. The publicly filed document in the *Harris* case is related to, but is not the same as, the agreement at issue in this case. The agreement here is between Saxon and Fidelity, and contemplates that Fidelity will enter into other agreements with law firms to handle Saxon's business related to mortgage foreclosures and bankruptcies. The agreement in the *Harris* case is the next link in the chain: it is an agreement between Fidelity and Mann & Stevens, P.C., one of the law firms to which Fidelity directs work after entering into agreements with entities such as Saxon.

There are many similarities between the two agreements. Notably, the *Harris* agreement refers to Fidelity's proprietary computer systems (although neither agreement spells out any details concerning the systems), addresses insurance requirements, contains a confidentiality clause with respect to client information, sets out a notice provision (including a requirement that notices be sent to Fidelity to the attention of Lawrence C. Dingmann, Jr.), and contains termination and indemnification provisions. The *Harris* agreement includes exhibit A titled "Fidelity National Foreclosure Solutions Network Schedule of Services" identifying the specific services that the law firm will provide to Fidelity as well as the services that Fidelity will provide to the law firm; exhibit B "Fidelity National Foreclosure Solutions Network Fees for Services Schedule for *Meritech*" stating the fees that will be billed to the Fidelity client and the fees that will be paid by the law firm to Fidelity; and exhibit C "Fidelity National Foreclosure Solutions Network Modified Fee Schedule" dated October 2, 2007 again stating the specific amount of fees to be

---

14. Saxon's counsel stated at the hearing that other courts have considered this issue, but did not provide copies of those decisions or case cites. *See* Local Bankr.R. 9013–2(d).

paid. The *Harris* agreement is signed by Lawrence Dingmann, Jr., vice president and division counsel. All of this information, including pricing details and services provided, has, therefore, been in the public domain since 2008.[15]

Exhibits A, B, and C of the agreement at issue in this case contain a pricing structure and a list of services nearly identical to the *Harris* agreement. Saxon did not provide any evidence that Fidelity, in fact, treats the agreement at issue or any part of it as either a trade secret or confidential information, and the evidence relied on by the UST is to the contrary. Saxon did not, therefore, meet its burden of proving that the agreement is entitled to protection under bankruptcy code § 107(b).

### CONCLUSION

For the reasons stated, Saxon's motion for a protective order is denied.

IT IS SO ORDERED.

---

15. Additionally, the court notes that Saxon filed a response to the court's order of April 10, 2009 which includes a detailed description of Fidelity's system and the services that it provides. *See* docket 50.